UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RYAN BARTON LASH,

    Plaintiff,

    v.

OFFICER JENNIFER LEMKE, et al.,

    Defendants.

Civil Action No. 12-0822 (JDB)

## MEMORANDUM OPINION

Plaintiff Ryan Barton Lash brings this action against defendants Officer Jennifer Lemke and Sergeant Todd Reid of the United States Park Police. Lash claims that defendants' actions violated his Fourth and First Amendment rights, and requests damages under Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388 (1971). Now before the Court is [12] defendants' motion to dismiss or, in the alternative, for summary judgment. Upon consideration of the motion, the opposition and reply thereto, and the entire record, and for the reasons described below, the Court will grant defendants' motion for summary judgment.

**I.    Background**

On January 29, 2012, Lash was participating in the "Occupy DC" movement in McPherson Square, where protesters had set up tents and makeshift shelters. Defs.' Stmt. of Mat'l Facts [ECF 12] ("Defs.' Stmt.") ¶¶ 1, 2.[1] On that date, United States Park Police ("USPP") officers began posting notices on the tents and shelters to convey the government's intent to enforce no-camping regulations. Id. ¶ 2. In response, "some of the individuals in McPherson

---

[1] Pursuant to Local Rule 7(h)(1), "in determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Accordingly, the Court will deem the paragraphs in defendants' statement of facts that were not disputed by plaintiff to be admitted. See Pl.'s Stmt. of Mat'l Facts as to which there exists a Genuine Dispute [ECF 15-2] ("Pl.'s Stmt.").

1

Square became agitated, verbally harassed the officers, and interfered" with the officers' distribution efforts. Id. ¶ 3. Lash swore at the officers, removed some of the notices from the tents, and put the notices in the trash. Id. ¶ 4. At this point, the parties' accounts of the facts diverge.

According to Lash, Officer Jennifer Lemke informed him that if he took down another notice, he would be arrested for disorderly conduct. Pl.'s Mem. in Opp'n. to Defs.' Mot. Dismiss or Summ. J. [ECF 15] ("Pl.'s Opp'n.") at 6. Lash then ceased taking down notices and walked away. Id. As he walked away, he said to a group of USPP officers, "You want us to clean up the trash in the park, right? Well[,] here's your fucking trash[,] you fucking pigs." Id. He then crumpled up the notices he had removed and put them in the trash. Id. Officers Lemke, Frank Hilsher, and Tiffany Reed, with Sergeant Todd Reid present, approached Lash, who said, "Why are you coming at me?" Id. Lash states that he "began walking around the park," but "did not attempt to run away or escape." Id. When the officers approached him, Lash claims that he did not see Officer Reed behind him and was "[s]tartled" when she tried to "grab[] his arms and pull[] them behind his back." Id. at 6-7. "Because he was being grabbed from behind, [Lash] did not know who was touching him." Id. Officer Hilsher then stepped in to help restrain Lash. Id. At that point, according to Lash, "[he] noticed it was Park Police Officers grabbing him [and] he allowed the officers to place his arms behind his back." Id. Lash alleges that Officer Lemke then tased him. Id.

In contrast, defendants contend that when the officers approached Lash after seeing him remove the notices, Lash "tried to get away from them." Defs.' Stmt. ¶ 5. When the officers attempted to arrest Lash, he refused to cooperate and physically resisted. Id. ¶ 6. The officers then "tried to wrestle him to the ground," but Lash continued to actively resist. Id. ¶ 7. Officer

2

Lemke removed her taser from its holster, but did not use it immediately. Id. ¶ 8. Lash refused to cease his active resistance, so Officer Lemke tased him. Id.

In addition to their written accounts of the facts, the parties also submitted video exhibits—one submitted by Lash and two submitted by defendants—that depict the events leading up to and during the arrest and taser deployment. See Exs. A, B to Defs.' Mot. Dismiss or Summ. J. [ECF 13]; Ex. 17 to Pl.'s Opp'n [ECF 16]. Lash's video exhibit begins with six USPP officers and several protesters standing next to tents in what appears to be McPherson Square. Ex. 17 to Pl.'s Opp'n at 0:00-0:12.[2] The protesters use profanity and yell at the officers. Id. Lash, wearing a red shirt and patterned pajama pants, bursts out of one of the tents. Id. at 00:15-00:17. He approaches the officers and yells, "You guys want to come at us tomorrow . . . I'm going to be one of the sleep strikers." Id. at 00:20-00:33. He then continues to yell about how he plans not to sleep for days and proclaims, "this is our park," while another protester yells, "bring it on, bitch," to the officers. Id. at 00:33-00:42.

Lash then tries to pull a wooden stake out of the ground. Id. at 00:48-00:50. When two of the officers see Lash's activity, they make downward motions with their hands—apparently indicating that he should stop trying to pull out the stake. It is not clear if the officers say anything to Lash or touch him, but Lash repeatedly yells, "Get your hands off me." Id. at 00:50-00:56. The officers then walk away and Lash yells at them to "get away from my tent." Id. at 00:56-1:06.

Lash follows the officers, yelling that they should come back tomorrow morning and that he is not going to sleep for days. Id. at 1:06-1:17. The officers stop to turn around and face him, and Lash continues to yell, but it is difficult to hear what he is saying. It is not clear whether the

---

[2] The numbers in the Court's citations to video evidence represent the time displayed when viewing the video. For example, an event that occurred between minute two and minute three of a video would be cited as 02:00-03:00.

officers have said anything to Lash at this point. The officers walk away for the second time, but Lash follows them and yells, and the officers turn around to face him again. Id. at 1:17-1:48. The officers walk away a third time, and Lash continues to follow them. Id. at 1:48-2:07. The officers and Lash then walk out of view of the camera, but Lash can be heard yelling, "We all know you are coming tomorrow. You're coming tomorrow, big fucking deal. We're aware. What difference does this make"—apparently in reference to the notices. Id. at 2:07-2:26. The video then shows Lash standing in front of several officers yelling, "Tell me what difference does it make," while he loudly claps his hands to punctuate his words. Id. at 2:26-2:30. Lash continues to yell at the officers and makes hand gestures toward them. Id. at 2:30-2:39.

The camera focuses elsewhere for a few moments, and when it refocuses on Lash and the officers, Lash is repeatedly yelling, "fuck your notices," and taking notices off the tents. Id. at 2:39-2:53. Lash quickly walks away from where the officers are standing and continues to tear down notices and yell. Id. at 2:53-3:16. The video then shows Lash walking by some tents with a handful of what appear to be crumpled notices as five USPP officers follow behind him in a single line, maneuvering between tents. Id. at 3:07-3:21. Lash yells, "What's a disorderly conduct on that," and quickly walks away in the background. Id. at 3:21-3:29. The officers appear to briefly talk to each other in the foreground, but their voices are inaudible. Id. Lash then yells, ". . . fucking notices, watch how many I ripped down." Id. at 3:29-3:35. The video then shows the officers walking in Lash's direction. Id. at 3:35-4:03. Lash yells something about "trash," which may be when he throws the notices in the trash, as described in Lash's account of the events. Id.; see also Pl.'s Opp'n at 6; Compl. [ECF 1] ¶ 13. Throughout the video, there are many protesters standing around or following the officers, and sometimes yelling at the officers. It is not clear whether the officers ever say anything to Lash because their voices are inaudible

4

throughout. The video concludes with the police attempting to restrain Lash and, eventually, tasing him, but it is difficult to see any detail because the camera is positioned fairly far away from the arrest.

Defendants' two videos were filmed closer to the arrest. Defendants' Video Exhibit B begins with a view of the USSP officers in what appears to be the McPherson Square tent camp.[3] Ex. B. to Defs.' Mot. Dismiss or Summ. J. at 00:00-00:02. The person filming says: "Now someone is ripping down the notices that the police gave us." Id. at 00:02-00:06. A voice that appears to be Lash's can be heard in the background yelling "tell them to clean up the trash in the fucking park" and, comporting with Lash's account of events, "here's your fucking trash, you fucking pigs." Id. at 00:07-00:13; Pl.'s Opp'n at 6. Several officers walk toward Lash, who eventually enters the view of the camera in his red shirt and pajama pants. Id. at 00:13-00:59. Lash yells "officers coming at me" several times, and then quickly walks away from the officers and between various tents. Id. at 00:59-1:12. Lash yells "Why are you coming at me," and continues to walk away from the officers. Id. at 1:18-1:25. Officer Lemke and Officer Reed, two female officers, try to approach Lash. Id. at 1:25-1:27. Lash yells "I've done nothing wrong" several times while walking away from Officers Lemke and Reed, then turns around to see the two officers following him and resumes walking away from them. Id. at 1:27-1:31.

At that point, Officer Reed tries to grab Lash's arms from behind him. Id. at 1:32-1:33. Lash pulls his arms from Officer Reed's grasp and continues to yell that he has "done nothing wrong." Id. Other protesters have gathered in the area and are yelling at the officers. Officer Reed tries to grab Lash's arms again, and Lash again pulls his arms out of her grasp. Id. at 1:34-1:35. Officer Hilsher, a male officer, then approaches Lash from Lash's front, right side and

---

[3] Video Exhibits A and B show the same sequence of events. The Court elects to use Video Exhibit B to recount the facts because it is filmed from a location closer to the events at issue.

5

grabs Lash's right arm while Officer Reed grabs Lash's left arm. Id. at 1:35-1:37. Lemke unholsters her taser while Lash continues to resist the other officers and to yell that he has "done nothing wrong." Id. at 1:37-1:40. While the officers continue to try to control Lash, Officer Lemke deploys the taser on Lash's lower back. Id. at 1:38-1:41. Lash falls to his knees and then rolls over onto his back. Id. at 1:41-1:43. He then rolls over onto his stomach. Id. at 1:44-1:46. At this point, Officers Reed and Hilsher are able to handcuff him. Id. at 1:47-1:58. The officers pull Lash to his feet and escort him out of the park. Id. at 1:58-2:12.

After the arrest, Lash filed a Bivens claim for civil damages against the defendant officers, claiming that they violated the Fourth Amendment by unlawfully using excessive force against him, and violated the First Amendment both by arresting him and by using excessive force in retaliation for Lash calling the officers "fucking pigs." Compl. ¶¶ 50-51, 53-55. Defendants moved to dismiss, or in the alternative, for summary judgment.

## II. Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); accord Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam). "[I]n passing on a motion to dismiss . . . the allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993). Therefore, the factual allegations must be presumed true, and plaintiffs must be given every favorable inference that may be drawn from the allegations of fact. See Scheuer, 416 U.S. at 236; Sparrow v. United Air

6

Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). However, the Court need not accept as true "a legal conclusion couched as a factual allegation," nor inferences that are unsupported by the facts set out in the complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Summary judgment, in turn, is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); see also Celotex, 477 U.S. at 323.

In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Moreover, "[i]f the evidence is merely colorable, or is not significantly probative,

7

summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment, then, is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

A motion to dismiss must be treated as a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court." Fed. R. Civ. P. 12(d); see also Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003) (holding that district court's consideration of matters outside the pleadings converted the defendant's Rule 12 motion into one for summary judgment). Here, because the parties have submitted matters outside of the pleadings that the Court has considered in resolving defendants' motion, the Court will treat defendants' motion as one for summary judgment.

### III. Discussion

"Qualified immunity shields government officials from civil damages liability." Reichle v. Howards, --- U.S. ---, 132 S. Ct. 2088, 2093 (2013) (citing Ashcroft v. al-Kidd, 563 U.S. ---, 131 S. Ct. 2074, 2080 (2011)). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft, 131 S. Ct. at 2085 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). Officer Lemke and Sergeant Reid, who were acting in the course of performing their official duties during the events involving Lash, argue that they are entitled to qualified immunity on Lash's Bivens claims. Defs.' Mot. Dismiss or Summ. J. [ECF 12] ("Defs.' Mot.") at 8. Those entitled to qualified immunity have "immunity from suit rather than a mere defense to liability." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (internal quotation omitted). Thus, immunity should be granted or denied at the earliest possible stage in the litigation because its purpose is to shield from suit those government officials who

8

act properly, and that purpose "is effectively lost if a case is erroneously permitted to go to trial." Scott, 550 U.S. at 376 n.2 (internal quotation omitted); accord Hunter 502 U.S. at 227. Accordingly, it is appropriate for this Court to rule on the issue of immunity on a properly supported motion for summary judgment.

The qualified immunity doctrine is governed by the Supreme Court's analysis set forth in Saucier v. Katz, 533 U.S. 194 (2001), as modified by the Court's later decision in Pearson v. Callahan, 555 U.S. 223 (2009). Saucier outlined a two-step approach, in which a court first decides whether the facts alleged demonstrate that the officer's actions violated a constitutional right. Saucier, 533 U.S. at 201. "If the facts alleged do not establish a constitutional violation, [a court] end[s] the inquiry and rule[s] for the officer." Johnson v. District of Columbia, 528 F.3d 969, 973 (D.C. Cir. 2008). But if the facts demonstrate a constitutional violation, a court then determines whether the right at issue was "clearly established" at the time of the officer's conduct. Id. Accordingly, to defeat a government official's claim of qualified immunity, a plaintiff must show both (1) that the facts alleged or shown make out a violation of a constitutional right, and (2) that the right was clearly established. See Saucier, 533 U.S. at 201. Pearson modified the Saucier approach such that lower courts may use their discretion to decide which of the two prongs to address first. See Pearson, 555 U.S. at 236; accord Reichle, 132 S. Ct. at 2093. Here, the Court will first examine whether Lash has demonstrated that Officer Lemke and Sergeant Reid violated his constitutional rights. And finding that Lash has failed to meet his burden, the Court need not reach the second prong and will grant summary judgment in favor of defendants.[4]

---

[4] Defendants also argue that Lash's claims are subject to dismissal because defendants were not properly served. Defs.' Mot. at 20-22. Because the Court is granting the motion for summary judgment, the Court need not reach this issue.

### A. Fourth Amendment Claims

Lash claims that Officer Lemke used excessive force when she tased Lash during his arrest and that "Sergeant Reid[] fail[ed] to supervise the situation or intervene in Officer Lemke's use of excessive force." Compl. ¶¶ 54-55. A claim of excessive force is "'properly analyzed under the Fourth Amendment's objective reasonableness standard,' which tracks the constitutional text by asking 'whether the force applied was reasonable.'" Johnson, 528 F.3d at 973 (quoting Graham v. Connor, 490 U.S. 386, 388 (1989), and Wardlaw v. Pickett, 1 F.3d 1297, 1303 (D.C. Cir. 1993) (internal quotations omitted)). Thus, the relevant inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Scott v. District of Columbia, 101 F.3d 748, 758 (D.C. Cir. 1996) (quoting Graham, 490 U.S. at 397). Because the inquiry is objective, the subjective good or bad faith of the officers is irrelevant. Wasserman v. Rodacker, 557 F.3d 635, 641 (D.C. Cir. 2009) (citing␣␣ 517 U.S. 806, 812-13 (1996)). Stated differently, then, "[a]n officer will only be held liable if the force used was so excessive that no reasonable officer could have believed in the lawfulness of his actions." Rogala v. District of Columbia, 161 F.3d 44, 54 (D.C. Cir. 1998) (citing Wardlaw, 1 F.3d at 1303); accord Scott, 101 F.3d at 759.

Courts determine the reasonableness of force based on the facts and circumstances of the case, including "the severity of the crime at issue," whether the suspect was "actively resisting arrest or attempting to evade arrest by flight," and whether the suspect "pose[d] an immediate threat to the safety of the officers or others." Graham, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about

10

the amount of force that is necessary in a particular situation." Id. at 396-97. Nonetheless, "[a]lthough we evaluate the reasonableness of the officers' actions by viewing the events from their perspective, we consider the facts in the record and all reasonable inferences derived therefrom in the light most favorable to [the plaintiff]." Scott, 101 F.3d at 759 (citing Wardlaw, 1 F.3d at 1303). A defendant's "motion for summary judgment is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." Wardlaw, 1 F.3d at 1303 (internal citation omitted).

In Arrington v. United States, the court held that where a plaintiff was punched, beaten with a baton and a pistol grip, and attacked by a police dog, such force by the police was unreasonable if the suspect had already been disarmed and handcuffed. 473 F.3d 329, 331-33 (D.C. Cir. 2006); see also Casey v. City of Federal Heights, 509 F.3d 1278, 1280, 1282-83 (10th Cir. 2007) (finding that officers used excessive force when seizing a nonviolent misdemeanant who was neither dangerous nor fleeing by putting him into an arm lock, jumping on his back, tasing him, handcuffing him, and then repeatedly banging his head into the concrete and tasing him again). In contrast, the court in Wardlaw concluded that no reasonable jury could find excessive force was used where the plaintiff rushed down a courthouse stairway toward two United States Deputy Marshals who were forcibly removing his friend from a courtroom, and one of the deputies punched the plaintiff in the jaw and several times in the chest. Wardlaw, 1 F.3d at 1300, 1303-04. In evaluating the reasonableness of the use of force, the Wardlaw court noted the vulnerability of the marshals in the stairwell, the fact that the plaintiff had shouted at the deputies as he approached them, and that the Marshals Service reasonably could have

11

anticipated a confrontation when removing a spectator from a courtroom where protester demonstrations were expected. Id. at 1303-04.

Here, defendants argue that Officer Lemke acted reasonably when she tased Lash because the USSP officers faced a "volatile situation" where "demonstrators or on-lookers in the park [crowded] near the officers and repeatedly yell[ed] and sw[ore] at them" while the officers attempted to arrest Lash, who had "aggressively attempted to evade arrest." Defs.' Mot. at 16, 18. The officers attempted to gain control over Lash, including by "wrestl[ing]" him to the ground, but Lash "vigorously" resisted and the officers were unable to handcuff him until the taser was used. Id. at 16.

Defendants also argue that Officer Lemke's actions were reasonable because USPP policies authorize the use of tasers "to gain control of an individual" or "to effect an arrest to ensure the protection of the public, the officer, and any arrestees." Ex. 2 to Defs.' Mot. (General Order No. 3605) [ECF 12-1] §§ 3605.01, 3605.02. Defendants contend that, during the arrest, Lash was "physically defying the officers to the point that a reasonable officer could have believed that plaintiff might inflict bodily harm on them." Id. at 17. Furthermore, the "arrest clearly needed to be effectuated quickly as the situation grew more volatile and the on-lookers grew more numerous and hostile to the officers." Id. at 18. In support of their stance, defendants cite an Eleventh Circuit case in which the court held that an officer's use of a taser was reasonable against a "hostile, belligerent, and uncooperative" individual who, despite being suspected of only having an improperly illuminated taillight, "used profanity, moved around and paced in agitation, and repeatedly yelled" at the officer. Id. at 19 (citing Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004)). Here, the officers were engaged in a physical struggle with a hostile, belligerent, and uncooperative individual—Lash—who had tried to evade them, had

12

yelled at them, and was physically resisting arrest. See id. at 20. Defendants argue that, similar to Draper, the use of the taser here was reasonable because it "may well have prevented 'serious harm' to Lash or the officers, given plaintiff's clear indication that he was not prepared to cease his active, physical resistance to arrest." Id.

Lash, on the other hand, argues that Officer Lemke's use of a taser during his arrest was unreasonable because the crime of which he was accused—disorderly conduct—was "relatively minor." Pl.'s Opp'n at 15. Moreover, he contends that he did not resist arrest—rather, he was surprised when Officer Reed grabbed his arms and his "instinct" to pull away was not indicative of resistance. Id. 16-17. Instead, he was acting reflexively and the "officers would not have had any reason to think that [his] response was voluntary." Id. at 17. Lash argues that he was unarmed and did not pose a threat. Id. at 16. In particular, he states that, because he was wearing pajamas, it should have been apparent to the officers that he was not armed. Id. Lash also contends that he never threatened the officers or took a "fighting stance." Id.

After careful consideration of the facts and circumstances, the Court concludes that no reasonable jury could find that Officer Lemke's use of force was so excessive that no reasonable officer could have believed in the lawfulness of her actions. Viewing the situation from the perspective of an officer at the scene, as the court must, Officer Lemke's use of the taser gun to effectuate the arrest of Lash was reasonably proportionate to the difficult and uncertain situation that the USSP officers faced.

First, although Lash's crime was nonviolent, the officers were in a hostile environment where protesters were yelling at and following the officers while the officers attempted to arrest Lash. Lash does not dispute that the police were in a protest area with a large number of

protesters present.[5] And the many tents in the area made it more difficult for the police to know exactly how many individuals were present and where they were located. Officer Lemke, aware of the ongoing protest and the presence of a large number of protesters, "reasonably could have anticipated a confrontation" while removing an uncooperative protester from the tent camp. See Wardlaw, 1 F.3d at 1303-04; see also Oberwetter v. Hilliard, 639 F.3d 545, 555 (D.C. Cir. 2011) (finding it reasonable for officer "quickly and forcefully" to arrest plaintiff engaged in a silent dance demonstration to reduce "the risk of interference or escape" when plaintiff was part of a group of 18 people, whose presence could have caused the officer "to be reasonably worried that events might get out of hand").

Furthermore, Lash actively resisted arrest. Although he argues that he tried to "defuse" the situation, that he pulled his arms away from the officers when they tried to handcuff him only because he was "startled," and that he "did not actively resist arrest," Pl.'s Opp'n at 7; Pl.'s Stmt. ¶¶ 1-2, that account does not comport with the parties' video exhibits, which show that Lash was belligerent, aware of the officers' approach, and physically resistant to the officers' attempts to handcuff him, see Ex. 17 to Pl.'s Opp'n; Exs. A, B to Defs.' Mot. It is appropriate to rely on that clear evidence of the events at issue here. Where the nonmoving party's evidence at summary judgment is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of summary judgment." Scott, 550 U.S. at 380; see also White v. United States, 863 F. Supp. 2d 41, 49 (D.D.C. 2012) (granting defendant's motion for summary judgment where video evidence contradicted assertion that

---

[5] Lash states that there were approximately 80-90 protesters in McPherson Square on January 29, 2012. Lash Decl. [ECF 15-1] ¶ 37(a). Sergeant Reid states that there were "hundreds of individuals filling McPherson Square, as well as temporary structures, tents, and shelters which concealed a large portion of the individuals." Reid Decl. [ECF 12-1] ¶ 4. Regardless of the exact total count, the parties agree that there were a large number of protesters present in the park.

14

decedent "had both hands raised in a gesture of surrender"). Lash does not challenge the video evidence and, in fact, submits his own video, which documents the same series of events.

The Court has carefully reviewed these video exhibits. As previously described, Lash's Video Exhibit 17 shows that, from the time the USSP officers encountered Lash, he was hostile and belligerent. Initially, Lash follows and yells at the officers as they repeatedly try to walk away from him. After Lash removes some notices, the officers turn their attention to him, and Lash then tries to evade them by quickly walking away. The officers pursue Lash through the park while he continues to walk away from them. Defendants' Video Exhibit B shows Lash yelling, "officers coming at me"—indicating that he is aware that the officers are approaching him—and yelling "I've done nothing wrong" as he moves away from Officers Lemke and Reed—also indicating that Lash is aware the officers are pursuing him. Lash continues to evade and yell at the officers when they try to approach him. And despite being aware of the officers' approach, Lash twice pulls his arms away from Officer Reed, and then continues to resist by physically struggling with Officers Reed and Hilsher as they try to constrain him from either side.

The unbiased video evidence thus "blatantly contradict[s]" Lash's assertion that he did not actively resist arrest. See Scott, 550 U.S. at 380. Based on this evidence, no reasonable jury could believe Lash's version of these events, and hence, the Court will not adopt Lash's version for the purpose of summary judgment. See id.; see also Johnson v. Washington Metro. Area Transit Auth., 883 F.2d 125, 128-29 (D.C. Cir. 1989) (finding that summary judgment is appropriate "when a plaintiff's claim is supported solely by plaintiff's own self-serving testimony, and undermined by other credible evidence"), abrogated on other grounds by Belton

15

v. Washington Metro. Area Transit Auth., 20 F.3d 1197 (D.C. Cir. 1994). The Court concludes that a reasonable officer on the scene would have believed that Lash was actively resisting arrest.

Moreover, a reasonable officer could have believed that Lash posed an immediate threat to the safety of the officers or others. Lash's contention that the officers should have known that he "never posed a risk of harm to anyone" and was unarmed and not a threat because he was in pajamas ignores that he was in close physical proximity to the officers and their weapons, and that he physically resisted their attempts to handcuff him. See Pl.'s Stmt. ¶ 8; Pl.'s Opp'n at 16. As noted by defendants, "[t]here is always a potential threat to officers when they are that close to an individual who they are trying to arrest, because the individual may try to grab one of the officer's weapons or actually hit an officer trying to arrest him." Defs.' Reply at 7. In this situation, Officer Lemke was "forced to make [a] split-second judgment[]—in circumstances that [we]re tense, uncertain, and rapidly evolving—about the amount of force that [wa]s necessary." Graham, 490 U.S. at 396-97. Additional attempts at physically handcuffing Lash "may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which the arresting officers" could be injured by Lash or other protesters. See Draper, 369 F.3d at 1278. Hence, viewing the situation from the standpoint of an objectively reasonable officer, the single, five-second taser deployment[6] was reasonably proportionate to the need to subdue Lash and thereby to reduce the risk of further physical confrontation.

---

[6] Defendants submit that Lash was tased only once, while Lash claims that he was tased a second time when he was on the ground and handcuffed. Compare Defs.' Mot. at 4 with Pl.'s Stmt. ¶ 3; Pl.'s Opp'n at 15, n.1. In support of his claim, Lash states that he could hear "the clicking of the TASER and could feel its effects." Lash Decl. ¶ 20. Lash directs the Court to his video exhibit at "approximately 5:40" when, he argues, the second deployment "can be heard." Id. After numerous viewings of Lash's video, the Court cannot agree that the clicking of the taser can be heard—instead an extremely loud police whistle and the yells of numerous protesters overwhelm the audio. Lash stated that "[a] copy of the TASER's datapoint readout would likely be able to settle this dispute" over how many times the taser was deployed. Pl.'s Opp'n at 15 n.1. In response, defendants submitted Officer Lemke's declaration, stating that she tased Lash only once, as well as the taser data report, which confirms that the taser was deployed only once for five seconds on January 29, 2012 at around the time of Lash's arrest. Defs.' Reply at 11-12; Ex. A to Defs.' Reply (Decl. of Officer Jennifer Lemke ¶ 14; Taser Data Report at 2). Lash has not disputed the taser data report, and "[a]t the summary judgment stage, facts must be viewed in the light most

Lash asserts that the lack of police warnings during his arrest should support a finding that the taser deployment was unreasonable. Specifically, he argues that, after he "pulled away" from Officer Reed, "he was not told to stop resisting or that he was going to be TASERed if he continued resisting." Pl.'s Opp'n at 17. Defendants contend that they did provide warnings to Lash. See Defs.' Mot. at 4; Defs.' Reply at 9. It is not clear whose account is correct because the audio on the video exhibits does not clearly pick up the officers' voices. Drawing all inferences in favor of Lash, as the Court must, the officers' lack of warning nonetheless does not raise Officer Lemke's use of the taser to the level of excessive force.[7] Although whether a warning is given is considered by some courts in determining if excessive force was used, it is not a dispositive factor. See Deorle v. Rutherford, 272 F.3d 1272, 1284 (9th Cir. 2001) ("[T]he giving of a warning or the failure to do so is a factor to be considered in applying the Graham balancing test."). Plaintiff cites the Fourth Circuit's finding of excessive force where an officer failed to give a verbal warning, in violation of police department's policies, before releasing a police dog trained to bite anyone it found into a home where the officer did not know who was present. Pl.'s Opp'n at 17 (citing Vathekan v. Prince George's County, 134 F.3d 173, 179-80 (4th Cir. 1998)). Although the facts in Vathekan and the facts in this case are not analogous—unlike the officer who released a dog to bite whomever the dog found, Officer Lemke knew who she was tasing—

---

favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott, 550 U.S. at 380 (citing Fed. R. Civ. P. 56(c)). "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Arrington, 473 F.3d at 333 (quoting Anderson, 477 U.S. at 247). Therefore, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). And "[i]f the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50. Here, Lash provides no other evidence in support of his claim, and the undisputed taser readout objectively demonstrates that the taser was used only once around the time of Lash's arrest. Accordingly, no reasonable jury could find in favor of Lash on this issue and, therefore, there is no genuine dispute.

[7] Similarly, Lash's arguments regarding the alleged lack of other warnings or communications do not transform Officer Lemke's actions into the use of excessive force. See Pl.'s Stmt. ¶¶ 4 (Officer Lemke only warned Lash once to cease removing notices), 5 (Lash stopped removing notices after he was warned), 6 (the officers did not tell Lash to put his hands behind his back), 7 (Lash was not told he was under arrest until he was in the police cruiser). Even assuming Lash's allegations to be true, these facts do not outweigh the factors supporting the reasonableness of Lemke's use of force.

Lash argues that, similar to the officer in Vathekan, Officer Lemke was required by department policy to give a verbal warning prior to deploying a taser. See Pl.'s Stmt. ¶ 9; Lash Decl. ¶ 37(g). In response, defendants point out that the USPP general order authorizing the use of tasers to effectuate arrests states only that a verbal warning should be given prior to deploying a taser "if practicable." Defs.' Reply at 10; Ex. 2 to Defs.' Mot. § 3605.06(D)(5) ("When the decision to use [a taser] is made, the officer using it shall give an audible verbal warning to the intended recipient and other persons nearby immediately prior to its use, if practicable."). An order stating that a warning shall be given "if practicable" cannot be construed to require a warning in all situations. And even if it was practicable[8] for Officer Lemke to provide a warning prior using a taser to subdue Lash, the lack of a warning does not overcome the other facts and circumstances of the arrest, which support the reasonableness of Officer Lemke's use of the taser.

Accordingly, in light of all the facts and circumstances, no reasonable jury could find that Officer Lemke's use of force was so excessive that no reasonable officer could have believed it was lawful. Therefore, Officer Lemke did not violate Lash's constitutional rights during the arrest. Sergeant Reid, then, is also not liable for excessive force for his alleged failure to "adequately plan and direct the execution of the arrest of Mr. Lash," and did not violate Lash's constitutional rights. See Pl.'s Opp'n at 18, n.2. Because Lash was not deprived of his constitutional rights, the Court need not proceed to the second prong of the analysis, and defendants are entitled to qualified immunity on Lash's Fourth Amendment claims.

**B. First Amendment Claims**

Lash initially alleged violations of his First Amendment rights under two theories: retaliatory arrest and retaliatory use of excessive force. Compl. ¶¶ 50, 51. However, Lash has conceded that his First Amendment claim for retaliatory arrest cannot proceed because of the

---

[8] The order does not provide guidance on what is "practicable."

Supreme Court's recent decision in Reichle, which held that it was not clearly established that a retaliatory arrest supported by probable cause would violate the First Amendment. Pl.'s Opp'n at 19.

Lash maintains his other First Amendment claim, and argues that his "right to be free from the chilling effect of excessive force by police officers at a protest was well-established" at the time of the incident in question. Pl.'s Opp'n at 19. However, as discussed in the previous section, Lash was not subjected to excessive force in the course of his arrest. Hence, his allegation that he was subjected to excessive force as retaliation for his exercise of his First Amendment rights also fails, and defendants are entitled to qualified immunity on Lash's First Amendment claims.

## **CONCLUSION**

For the reasons explained above, the Court will grant defendants' motion for summary judgment, dismiss Lash's claims against defendants with prejudice, and enter judgment in favor of defendants on all of the claims against them. A separate order will be entered with this memorandum opinion.

/s/
JOHN D. BATES
United States District Judge

Dated: September 20, 2013